# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2048-24

V.G.,[1]

     Plaintiff-Respondent,

v.

P.G.,

     Defendant-Appellant.

_____

     Submitted April 30, 2026 – Decided July 9, 2026

     Before Judges Mawla and Bishop-Thompson.

     On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FV-16-1937-23.

     Mandelbaum Barrett PC, attorneys for appellant (David S. Carton and Rebecca E. Frino, on the briefs).

     Sherwood, Johnson, & Poles, LLC, attorneys for respondent (Matthew J. Dourdis, on the brief).

---

[1] We use initials to protect the confidentiality of domestic violence proceedings and the parties. R. 1:38-3(d)(9), (10).

PER CURIAM

Defendant P.G. appeals from the January 28, 2025 final restraining order (FRO) entered against him in favor of plaintiff V.G., his estranged sister, pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Defendant argues the court misapplied Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006), erred in finding harassment under N.J.S.A. 2C:33-4, and improperly issued an FRO. He further asserts the temporary restraining order (TRO) was not supported by allegations that constituted domestic violence. Defendant also argues public policy prohibits the use of domestic violence allegations to gain advantage in family disputes. Unpersuaded by these arguments, we affirm.

Plaintiff obtained an initial TRO against defendant in March 2023, alleging terroristic threats and harassment. The TRO was subsequently amended three times.[2] After a delay in service of the TRO, numerous adjournments and

---

[2] Plaintiff made an application to amend the initial TRO. In her application, plaintiff stated the predicate act occurred on January 27, 2022; and not January 27, 2023. The TRO was amended: on August 12, 2024; on October 17, 2024, which added the predicate acts of cyber harassment and contempt of a domestic violence order; and on December 10, 2024.

continuances, an FRO hearing was conducted. Plaintiff was represented by counsel; defendant was self-represented.

Plaintiff resides in New Jersey. She testified she and defendant had not resided together since 2002. Defendant resides in Florida but has connections to New Jersey through his two businesses and friends. Both parties are health care proxies for their elderly father, who suffers from dementia. As of January 2022, their father had been residing in plaintiff's home for several months. On January 27, while on a speakerphone call with their father, defendant stated he intended "to come over soon." Fearing for her safety and their father's well-being, plaintiff immediately went to the police.

Plaintiff testified, upon returning home, she found defendant had arrived at her home. Defendant first made a "f**k you" gesture, then changed it to a "pulling the trigger" gesture, mimicking the action of firing a gun—an action he had previously done in 2008. Plaintiff was afraid because defendant owned firearms. Defendant refused to leave her home.

Plaintiff also recounted a years-long history of ongoing conflict, including allegations defendant physically and emotionally abused her beginning in childhood and continuing into young adulthood. For example, in 1987, defendant chased plaintiff with handcuffs, causing her to fall and lose three

3

teeth. During moments of anger, defendant has called plaintiff derogatory names, including "f**king idiot," "stupid b***h," "c**t," and "loser." Since late 2017 or early 2018, plaintiff has been "constantly exposed" to defendant due to his "unrelenting and persistent contact[]," despite being repeatedly told—verbally and by text message—to stop contacting her.

In March 2023, plaintiff was appointed as a trustee of their father's company and began working alongside him. On February 3, 2024, defendant sent an email with the subject "Restraining order" to their father's business email and copied a long-standing client. The email included an image of the TRO. In the email, defendant claimed plaintiff lost her three front teeth due to an accident, and not the 1987 incident alleged in the TRO. According to plaintiff, this email had a negative impact on her business.

Plaintiff testified she required the protection of an FRO because defendant had repeatedly failed to comply with court orders. Her testimony was corroborated by a police officer, who testified a summons and complaint had been issued against defendant for violating the TRO. Plaintiff restated she endured a "lifetime of physical . . . and other types of abuse," including "strang[ulation]," "choke holds," "punch[es]," "kick[s]," and "constant[]

A-2048-24

demean[ing]" behavior. She also stated she had previously filed four prior complaints against defendant.

Plaintiff presented the testimony of Veronica York, a certified domestic violence advocate who was qualified as an expert without objection from defendant. After reviewing this matter, York opined defendant's actions were intended to cause "as much stress and fear as possible for [plaintiff]" and to "regain[] control" by using tactics he knew would upset her. York explained sibling abuse is as common as abuse from parents or other close family members. She emphasized the need for safeguards for plaintiff due to defendant's lack of accountability, denial, and tendency to shift blame.

The parties' father testified via Zoom. He offered limited testimony.

Defendant testified, he accompanied their father and a police officer to plaintiff's apartment building to retrieve their father's license on January 27, 2022. When plaintiff refused to hand over the license, defendant called the police. After officers arrived, defendant was served with the TRO. The license was given to defendant following a discussion between the officers and plaintiff.

When asked if the TRO was entered in March 2023, defendant claimed he and their father went to plaintiff's apartment building in March, not January, and asserted plaintiff was mistaken about the date. He denied ever going to

plaintiff's building in January 2022, making any gestures or threats toward her, or instructing their father to ask plaintiff to dismiss the TRO.

When asked why an FRO should not be issued, defendant focused on plaintiff's alleged mental health issues and referenced a promise he made to their mother. He also admitted to calling plaintiff despite her clear request for no contact.

In rendering its oral decision, the court first addressed the credibility of the parties. It found plaintiff credible, finding her testimony, supported by the email and summons and complaint, consistent despite defendant's cross-examination. The court noted plaintiff wanted no contact with defendant and she was afraid of him. On the other hand, the court determined defendant's testimony lacked credibility because he changed his account of events. It noted defendant did not care plaintiff wanted no contact and insisted on continued contact with her "year in, year out", which evidenced a purpose to harass.

The court observed "the only purpose to . . . defendant contacting her, which was not wanted, not liked, as well . . . showing up at her place[—]and he did it twice[—]and he seemed to confuse the dates depending on the information the [c]ourt provided, is harassing. It's upsetting. It's annoying." The court also found an FRO was necessary to protect plaintiff because defendant's conduct

6

exhibited coercive control. It explained: "Part of a coercive control . . . [is] contacting somebody who does not want to be contacted and more so on special occasions . . . . It's controlling. There was no need for . . . defendant to do [contact plaintiff]."

The scope of appellate review following the grant of an FRO is limited. T.B. v. I.W., 479 N.J. Super. 404, 412 (App. Div. 2024). In reviewing "a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." J.D. v. A.M.W., 475 N.J. Super. 306, 312-13 (App. Div. 2023) (quoting N.T.B. v. D.D.B., 442 N.J. Super. 205, 215 (App. Div. 2015)). Generally, findings by a trial court "are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)).

"We defer to the credibility determinations made by the trial court because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of witnesses.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare, 154 N.J. at 412). Also, we afford "particular deference to the Family Part because of its 'special jurisdiction and expertise' in family matters." Harte

v. Hand, 433 N.J. Super. 457, 461 (App. Div. 2013) (quoting Cesare, 154 N.J. at 412). We, however, review a trial court's legal conclusions de novo. C.C. v. J.A.H., 463 N.J. Super. 419, 429 (App. Div. 2020).

"In adjudicating a domestic violence case, the trial judge has a 'two-fold' task." J.D., 475 N.J. Super. at 313 (quoting Silver, 387 N.J. Super. at 125). "The judge must first determine whether the plaintiff has proven, by a preponderance of the evidence, that the defendant committed one of the predicate acts referenced in N.J.S.A. 2C:25-19(a)." Ibid.

When harassment is the alleged predicate act, the court must find not only that the underlying conduct occurred but also that the defendant acted with the "purpose to harass." See J.D. v. M.D.F., 207 N.J. 458, 477 (2011); State v. Hoffman, 149 N.J. 564, 576-77 (1997). Harassment is defined under N.J.S.A. 2C:33-4, which states in relevant part:

> [A] person commits a petty disorderly persons offense if, with purpose to harass another, [they]:
>
> a.   Make[], or cause[] to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
>          . . . .

A-2048-24

c.  Engage[] in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

Where a predicate act has been proven, the second inquiry is whether the judge should enter an FRO "to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127. While the second inquiry "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)([7])." Ibid. (citation reformatted).

We reject defendant's contention the court misapplied Silver. Our review of the record shows the court's finding was supported by substantial, credible evidence, including both parties' testimony plaintiff clearly wanted no contact with defendant, which he disregarded. Plaintiff proved harassment under N.J.S.A. 2C:33-4(a) and (c).

We also reject defendant's argument plaintiff's fourteen-month delay in seeking the TRO shows she was not in need of protection, and it was issued in error. Plaintiff's delay is not dispositive because a victim of domestic violence can have innumerable reasons for not immediately seeking a TRO. On this record, and given the court's factual and credibility findings, which we owe

A-2048-24

deference to, we are satisfied the delay in seeking a TRO was not a bar to plaintiff seeking the protection of a TRO.

While not explicitly stated, the court properly evaluated the risk of future harm to plaintiff under the statutory factors, including coercive control under N.J.S.A. 2C:25-29(a)(7) and the parties' prior history. In doing so, the court considered the pattern of unwanted communication before the TRO—particularly on plaintiff's birthday and holidays—and defendant's continued contact after the TRO, despite repeated requests for no contact. It properly concluded an FRO was necessary to protect plaintiff from future contact and abuse, as defendant's ongoing contact with plaintiff was found to be controlling. Accordingly, we perceive no basis to disturb the court's ruling.

To the extent we have not addressed any of defendant's remaining arguments, we conclude those arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-2048-24